IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LA JOLLA PHARMA, LLC,                    )
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )
                                         )        1:24-cv-951 (LMB/WBP)
JOHN A. SQUIRES, *Under Secretary of*    )
*Commerce for Intellectual Property and* )
*Director of the United States Patent and* )
*Trademark Office*,                      )
                                         )
          Defendant.                     )

MEMORANDUM OPINION

Plaintiff La Jolla Pharma LLC ("La Jolla") has filed a civil action under 35 U.S.C. § 145

seeking a judgment that two patent applications that were rejected by the U.S. Patent and

Trademark Office ("PTO") should be issued. Plaintiff names as the defendant in this civil action

the Director of the USPTO ("Director"). The parties have filed cross motions for summary

judgment, which have been fully briefed and oral argument has been held. Having reviewed the

record, the Court finds that La Jolla's claimed inventions were either anticipated by, or obvious

to, a person having ordinary skill in the art at the time that the applications were filed.

Therefore, the Director's motion for summary judgment will be granted, and La Jolla's motion

for partial summary judgment will be denied.

## I. BACKGROUND

A. Applications at Issue

On December 14, 2018, La Jolla filed U.S. Patent Application No. 16/220,901 ("the '901

Application") for an invention titled "Angiotensin Compositions and Methods Related Thereto."

The '901 Application related back to provisional application No. 62/599,606, which was filed on

December 15, 2017. Citing that same provisional application, on February 4, 2022, La Jolla filed

U.S. Patent Application No. 17/592,943 ("the '943 Application") for an invention bearing the

same title as the '901 Application.

After an extensive prosecution history, the following claims remained as to the '901 and

'943 Applications. The pending '901 Application claims are:

> **1.** A dosage form for treatment of distributive shock in a human patient comprising an amount of angiotensin II or a pharmaceutically acceptable salt thereof, wherein the amount is about 0.5 to about 20 mg of angiotensin II, and wherein the dosage form is sterile.

> **5.** The dosage form of claim 1, wherein the dosage form is substantially free of pyrogens.

> **6.** The dosage form of claim 1, wherein the angiotensin II or pharmaceutically acceptable salt thereof is provided as lyophilisate.

> **7.** A dosage form for treatment comprising an amount of a sterile, aqueous formulation of angiotensin II, or a pharmaceutically acceptable salt thereof, wherein the amount is about 0.5 to about 20 mg of angiotensin II.

> **10.** The dosage form of claim 7, wherein the formulation has a concentration of about 0.5 to about 20 mg/mL of angiotensin II.

> **13.** The dosage form of claim 1, wherein the dosage form has a volume between 0.5 mL and 100 mL.

> **14.** The dosage form of claim 13, wherein the dosage form has a volume of about 2 mL or about 1 mL.

> **20.** A kit comprising (i) the dosage form of claim 1, and (ii) instructions for diluting the dosage form with a solvent to achieve an aqueous formulation suitable for IV infusion.

> **21.** The kit of claim 20, comprising 2 to 5 units of the dosage form of claim 1, and the instructions are for combining the contents of at least 2 units to achieve the formulation.

[Dkt. No. 67] at 45. Only Claims 1 and 7 are independent claims. All dependent claims, except

for Claim 10, depend on Claim 1. Claim 10 depends on Claim 7.

The pending '943 Application claims are:

> **26.** A method for treating distributive shock in a human patient, comprising: diluting a dosage form comprising about 0.5 to about 20 mg of angiotensin II in a pharmaceutically

acceptable carrier to provide diluted solution of angiotensin II; and administering the diluted solution of angiotensin II to the patient via continuous intravenous infusion.

**31.** The method of claim 26, wherein the pharmaceutically acceptable carrier is a saline solution.

**32.** The method of claim 31, wherein the saline solution is 0.9% sodium chloride.

**33.** The method of claim 31, wherein the diluted solution of angiotensin II has a connection of about 0.005 mg/mL to about 0.01 mg/mL

**35.** The method of claim 26, wherein the angiotensin II in the dosage form is in an aqueous solution having an angiotensin II concentration of 2.5 mg/mL.

**36.** The method of claim 35, wherein the dosage form comprises about 1 mL of the aqueous solution.

**37.** The method of claim 26, wherein the angiotensin II in the dosage form is lyophilizate.

**38.** The method of claim 26, wherein the distributive shock is septic shock.

**39.** The method of claim 26, wherein the diluted solution of angiotensin II comprises about 0.005 mg/mL to about 0.01 mg/mL angiotensin II [sic].

Id. Claim 26 is the only independent claim in the '943 Application. Claims 31, 35, 37, 38, and 39 depend on Claim 26; Claims 32 and 33 depend on Claim 31; and Claim 36 depends on Claim 35.

Both patent applications relate to the medical treatment of distributive shock, which is a critical condition in which a person experiences low blood pressure (also known as hypotension) and insufficient blood distribution resulting in degraded organ function due to reduced access to blood and the oxygen that it carries. Because distributive shock can cause severe adverse health effects within minutes, it generally requires immediate medical treatment. Distributive shock is typically caused by sepsis[1] or a severe allergic reaction.

---

[1] Sepsis is the body's extreme response to an infection, often due to bacteria being in the blood.

Angiotensin II ("Ang II") is a naturally occurring hormone in humans and some other animals, including bovines,[2] that increases blood pressure by constricting blood vessels. Ang II is generally used to treat distributive shock after two other vasoconstrictors[3]—norepinephrine and vasopressin—have been administered and the patient is still in need of treatment. La Jolla sells a salt of Ang II diluted in a liquid or aqueous solution under the brand name Giapreza.[4] Giapreza is administered directly into the patient's veins.[5] Intravenous administration of Ang II in an aqueous solution is considered the only viable method of delivering Ang II to a patient because Ang II has an extremely short half-life and therefore must be provided to the patient continuously to have a sustained effect.

La Jolla contends that, as reflected in its '901 Application, it has invented a unique dosage form of Ang II and, as reflected in its '943 Application, a unique method for delivering that dosage form to treat distributive shock. The effective filing date of these applications, for the purposes of evaluating what is prior art,[6] is December 15, 2017, which was when La Jolla filed its provisional patent application. See 35 U.S.C. § 119(e).

La Jolla identifies two primary differences between its dosage form and method of administering that dosage form and the prior art that existed before December 15, 2017. First, before La Jolla began distributing Giapreza, Ang II was only medically available as a freeze-

---

[2] Examples of bovines include cattle, bison, buffalo, and yak.

[3] Medications that constrict blood vessels are called vasoconstrictors or vasopressors.

[4] A salt form of Ang II is referred to as Ang II acetate.

[5] Medications administered directly into a patient's veins are referred to as being administered intravenously or via IV.

[6] Prior art is publicly available information that existed before the effective filing date of the patent application and that can be used to assess whether the claimed invention is novel and non-obvious, and therefore patentable.

dried (i.e., lyophilized) powder or crystal and could not be administered intravenously without first being reconstituted.[7]  One example of freeze-dried Ang II is Hypertensin, a drug that uses a modified form of bovine-derived Ang II.  Hypertensin was approved by the U.S. Food and Drug Administration ("FDA") in the early 1960s, but withdrawn from the market in 2009 for reasons unrelated to safety.  As a peptide hormone,[8] Ang II was historically stored and transported in freeze-dried form because Ang II and other peptides are typically more stable and thus degrade less in freeze-dried form rather than in liquid form.  See [Dkt. No. 57] at 17 ("Proteins and peptides generally must be freeze-dried for clinical and commercial use.").  Reconstituting Ang II powder is a time-consuming process, which can be problematic when treating human patients in shock who require rapid assistance.  Indeed, the difficulties of reconstituting Ang II powder contributed to declining use of Hypertensin for clinical treatment of hypotension.  La Jolla argues that the liquid dosage form of Ang II described in its '943 Application does not have this administration problem.

Second, La Jolla explains that Bachem, the only commercial supplier of Ang II suitable for intravenous administration when La Jolla began selling Giapreza, sold vials containing 0.05 mg of Ang II.  A distributive shock patient requires an average daily Ang II dose of about 4.00 mg, which means a medical provider would have to use about 80 of these vials per day per patient and reconstitute each one manually—a time-consuming process that would increase the risk of dosing errors and contamination.  La Jolla contends that this cumbersome approach was taken because the conventional wisdom in the art was that using an Ang II vial containing about

---

[7] To reconstitute a medication that is in powdered form is to dilute and dissolve it into a liquid solution, typically by combining it with water or a saline solution, which is a mixture of salt and water.

[8] A peptide hormone is a water-soluble molecule that typically consists of amino acids linked by chemical bonds.

0.5 mg or more would be incompatible with good clinical practices and pose a significant risk of patient death. La Jolla's proposed patents, conversely, are for a dosage form of about 0.5 mg to about 20 mg of Ang II. According to La Jolla, this increased dosage form can be administered safely and allows for more suitable treatment of patients suffering from distributive shock by providing for continuous infusion of Ang II for hours or days at a time.[9]

B. Procedural History

A patent examiner at the U.S. Patent and Trademark Office ("PTO") rejected the '901 Application on January 26, 2023, on the basis that the claimed invention would have been obvious before the effective filing date to a person having ordinary skill in the art, see 35 U.S.C. § 103, and because the claimed inventions were for a natural product that was ineligible to patent under 35 U.S.C. § 101. The '943 Application was similarly rejected by a patent examiner on November 17, 2023, on the basis that the claimed invention would have been obvious under 35 U.S.C. § 103. See [Dkt. No. 1] at 5. La Jolla appealed both decisions to the Patent Trial and Appeal Board ("PTAB"). See 35 U.S.C. § 134(a). In an April 2, 2024 ruling, the PTAB found that the examiner had incorrectly determined that the claimed invention in the '901 Application was ineligible to patent, but affirmed the examiner's rejection of the '901 Application as obvious. On June 26, 2024, the PTAB also affirmed the examiner's rejection of the '943 Application, finding that its claims were obvious.

La Jolla has sought judicial review in this Court under 35 U.S.C. § 145, which permits "[a]n applicant dissatisfied with the decision of the [PTAB]" to commence a "civil action against the [PTO] Director" in the Eastern District of Virginia, upon which this Court "may adjudge that

---

[9] La Jolla also draws a third distinction between Hypertensin as described in the prior art and Giapreza: Hypertensin uses a modified bovine variant of Ang II whereas Giapreza uses the human variant of Ang II.

such applicant is entitled to receive a patent for his invention, as specified in any of his claims involved in the decision of the [PTAB]." Id.  To challenge the two PTAB decisions, La Jolla filed two civil actions against the PTO Director.  In the first civil action, filed on June 3, 2024, La Jolla contends that the PTAB and PTO examiner erred because the pending claims in the '901 Application are patentable, nonobvious, and satisfy all applicable statutory and regulatory requirements to receive a patent.  [Dkt. No. 1] at 9.  In the second civil action, filed on August 28, 2024, La Jolla contends that the PTAB and PTO examiner similarly erred in rejecting the pending claim in the '943 Application.  E.D. Va. 1:24-cv-1491 [Dkt. No. 9].  In each civil action, La Jolla requests that the Court set aside the PTAB's conclusions, declare that La Jolla is entitled to issuance of a patent covering its pending claims, and direct the PTO Director to issue the patents.  Id. at 10; [Dkt. No. 1] at 10.

The Court granted La Jolla's Unopposed Motion to Consolidate Cases, thereby placing judicial review of both the '901 and '943 Applications into this one civil action.  See [Dkt. No. 43].  After the Court granted a Joint Motion for a Briefing Schedule for Combined Summary Judgment and Claim Construction Motions, see [Dkt. No. 49], La Jolla filed a Motion for Partial Summary Judgment and Claim Construction.  In its motion, La Jolla asserts that Claims 7 and 10 of its '901 Application and Claims 35 and 36 of its '943 Application are not obvious to a person with ordinary skill in the art and could not be anticipated because no prior art contained a liquid dosage form of Ang II.  See [Dkt. Nos. 53, 55].  La Jolla also moved to exclude the expert opinions of Dr. Laird Forrest, who, according to La Jolla, is not a person of ordinary skill in the art because he lacks specialized knowledge, training, and experience with treating distributive shock, Ang II, and the treatment of human patients.  See [Dkt. No. 54].  The PTO Director filed its own Motion for Summary Judgment opposing La Jolla's motions and asserting that the PTO

Director is entitled to judgment as a matter of law because the claims in the '901 and '943

Applications were anticipated and obvious. See [Dkt. Nos. 66, 67].

C. Prior Art at Issue

The PTO Director has identified five sources of prior art for the '901 and '943

Applications: (1) the Physician's Desk Reference ("PDR");[10] (2) Nassif;[11] (3) Del Greco;[12] (4)

Tidmarsh;[13] and (5) Chawla.[14] Each of these sources will be briefly described because they form

the basis for the PTO Director arguing that the claims in the '901 and '943 Applications were

either anticipated or obvious.

The PDR, published in 1969, discusses Hypertensin[15] as a medication supplied in 2.5 mg

vials of freeze-dried, bovine-derived Ang II[16] powder that is administered intravenously to treat a

human patient for most types of shock by raising the patient's blood pressure. [Dkt. No. 67-3] at

---

[10] Physicians' Desk Reference to Pharmaceutical Specialties and Biologicals (1969) Medical Economics, Inc. 24th Edition, available at the end of [Dkt. No. 67-2] and the beginning of [Dkt. No. 67-3] as Exhibit 14.

[11] Nassif, et al., Angiotensin II in Treatment of Hypotensive States, JAMA 183(9):751–54 (1963), available at [Dkt. No. 67-3] as Exhibit 18.

[12] Del Greco & Johnson, Clinical Experience with Angiotensin II in the Treatment of Shock, JAMA 178(10):994–99 (1961), available at [Dkt. No. 67-3] as Exhibit 15.

[13] Tidmarsh, Methods for Treating Hypotension, WO 2016-007589 (2016), available at [Dkt. No. 68-3] as Exhibit 36.

[14] U.S. Patent Application No. 2015/0164980 A1 (filed June 18, 2015) (inventor Chawla), available at [Dkt. No. 67-1] as Exhibit 7.

[15] The PDR refers to Hypertensin, which was distributed by the pharmaceutical company CIBA (now Novartis), as "Hypertensin-CIBA." [Dkt. No. 67-3] at 2.

[16] The PDR does not explicitly use the term "angiotensin II" in its entry for Hypertensin or explain that it is bovine-derived. The PDR instead refers to Hypertensin as an "angiotensin amide;" but it is beyond reasonable dispute that the PDR is referring to Ang II when it discusses the angiotensin amide in Hypertensin; specifically, it is referring to one of Ang II's bovine-derived variants. See [Dkt. No. 67-3] at 5 (Del Greco discussing Hypertensin as a "angiotensin II amide").

3. The PDR also refers to a liquid version of Ang II that is made by adding 5 mL of sterile water to freeze-dried Ang II powder to form a solution with a concentration of 0.5 mg/mL Ang II. Id. The PDR discusses two ways that Hypertensin can be diluted so that it can be administered intravenously: further diluting the liquid version of Ang II by adding saline before administration; or adding 500 mL of a saline or glucose solution to the 2.5 mg freeze-dried dosage form of Hypertensin to create a concentration of 0.005 mg/mL Ang II. Id.

Nassif, published in 1963, discusses using Hypertensin—similarly described as being supplied in 2.5 mg vials of freeze-dried Ang II—to treat distributive shock by increasing blood pressure. Id. at 278. Nassif also discusses creating a liquid solution with 0.5 mg/mL of Ang II by diluting the 2.5 mg freeze-dried crystals of Ang II into a solution with 5 mL of sterile liquid comprised of 1% NaCl or 5% glucose in water. Id. Nassif explains how to further dilute this liquid Ang II solution by adding 250 mL of 1% NaCl or 5% glucose in water, resulting in a concentration of 0.0098 mg/mL Ang II (2.5 mg / (5 mL + 250 mL)), which Nassif deemed suitable for intravenous administration. Id.; see id. at 165.

Del Greco, published in 1961, discusses using Hypertensin supplied in 0.5 mg vials of freeze-dried Ang II for administration by intravenous infusion to treat distributive or septic shock by increasing blood pressure and maintaining it within normal limits. Id. at 5. Del Greco also discusses creating a liquid form of Ang II by dissolving 0.5 mg vials of freeze-dried Ang II into 200 to 500 mL of liquid (specifically, "5% dextrose in water of normal saline"). Id.

Tidmarsh, published in 2016, discusses methods of administering Ang II to increase low blood pressure and thus treat hypotension caused by distributive shock. [Dkt. No. 68-3] at 19, 28. Tidmarsh states that bovine-derived Ang II may be used, and discusses an Ang II composition that has a concentration of 2.5 mg/mL. Id. at 28, 30. Lastly, Chawla, published in

2015, discusses a method of treating distributive shock using human Ang II after sterile aqueous preparation to create an injectable liquid solution.  [Dkt. No. 67-1] at 324.

## II. DISCUSSION

### A. Standard of Review

A civil action under 35 U.S.C. § 145 is a "hybrid action," combining aspects of an administrative appeal and a new evidentiary proceeding.  Hyatt v. Kappos, 625 F.3d 1320, 1322 (Fed. Cir. 2010), aff'd and remanded, 566 U.S. 431.  In a § 145 proceeding, the parties "may introduce new evidence before the district court that was not presented to the Patent Office."  Taylor v. Matal, 2017 WL 3446532, at *10 (E.D. Va. Aug. 10, 2017) (citing Hyatt, 625 F.3d at 1322).  Without new evidence, the district court must review the case "on the same record presented to the agency and . . . apply the APA's substantial evidence standard to the Patent Office fact findings," id. (citing Hyatt, 625 F.3d at 1336); however, if new evidence is introduced, the district court must make de novo findings on disputed questions of fact, "assess[ing] the credibility of new witnesses and other evidence, determin[ing] how the new evidence comports with the existing administrative record, and decid[ing] what weight the new evidence deserves," id. at *11 (quoting Kappos v. Hyatt, 566 U.S. 431, 445 (2012)).

The PTO Director may assert not only new evidence, but also new arguments and "meritorious defenses" for why the claimed inventions are unpatentable.  Hyatt v. Hirshfeld, 998 F.3d 1347, 1363 (Fed. Cir. 2021).  When the PTO Director asserts defenses not in the administrative record, the Director must prove the newly raised defenses by a preponderance of the evidence.  See Immunogen, Inc. v. Vidal, 653 F. Supp. 3d 258, 266 (E.D. Va. 2023); Hirshfeld, 998 F.3d at 1363, 1370 (discussing how the PTO "carried its burden of proving" new grounds for unpatentability not previously raised).

B. Claim Construction

This civil action turns in large part on claim construction, which is an issue of law for the Court to resolve.  See Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 325–27 (2015) (stating that courts are to "treat the ultimate question of the proper construction of the patent as a question of law," while recognizing that "subsidiary factfinding is sometimes necessary").  Claim construction is the Court's determination of the meaning of the terms in the patent claims.  See id.; Markman v. Westview Instr., Inc., 517 U.S. 370, 372 (1996).  Claims "are generally given their ordinary and customary meaning," which is construed from the perspective of a person with ordinary skill in the art "as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).[17]  "Where a claim term has more than one plain and ordinary meaning, [courts] look to the specification to ascertain which definition is intended."  Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue

_____

[17] During PTO examination while claims are still being amended, "claims are to be given their broadest reasonable interpretation consistent with the specification."  In re Am. Acad. of Sci. Tech Ctr., 367 F.3d 1359, 1364 (Fed. Cir. 2004) (cleaned up).  The purpose of this approach is to "reduc[e] the possibility that claims, finally allowed, will be given broader scope than is justified," id. (quoting In re Yamamoto, 740 F.2d 1569, 1571 (Fed. Cir. 1984)), as well as to "sharpen[] and clarify[] the claims during the application stage, when claims are readily changed."  In re Skvorecz, 580 F.3d 1262, 1267 (Fed. Cir. 2009).  In the present civil action, the PTO Director argues that the Court should construe the claims using the broadest reasonable interpretation standard; but this standard is "solely an examination expedient, not a rule of claim construction."  Id.  Because claims cannot be amended in a section 145 action as "the PTO's process is complete," Kappos, 566 U.S. at 446, district courts use the claim construction standard set out in Phillips, 415 F.3d at 1313, in which they determine "the ordinary and customary meaning" that a claim "term would have to a person of ordinary skill in the art in question at the time of the invention."  Id.; accord PPC Broadband, Inc. v. Corning Optical Comms. RF, LLC, 815 F.3d 734, 740 (Fed. Cir. 2016) ("District courts . . . do not assign terms their broadest reasonable interpretation" but rather "seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in Phillips").  Indeed, the PTO itself applies the Phillips framework to interpret claim terms when claims "have expired, and therefore may not be amended."  PPC Broadband, 815 F.3d at 740.  This Court will therefore apply the Phillips framework, not the broadest reasonable interpretation standard, to interpret claim terms.

Ridge X-Ray Co., 621 F. App'x 644, 649 (Fed. Cir. 2015) (cleaned up); see also Phillips, 415 F.3d at 1313 (explaining that a person with ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification").  Additionally, when the patent specification uses a clear signal to set out "a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess . . . the inventor's lexicography governs." Phillips, 415 F.3d at 1316.

Because the PTO Director has agreed in its summary judgment briefing to La Jolla's definition of a person with ordinary skill in the art definition, the Court will adopt that definition. In this civil action, a person with ordinary skill in the art is a person with "at least a Bachelor's Degree in chemistry, biology, pharmaceutical studies, or related area of study with 5 years of experience or more in [1] the development of parenteral pharmaceuticals[18] for treating human patients and/or [2] preparing or administering treatments to critically ill human patients with distributive shock." [Dkt. No. 68-3] at 156.

La Jolla proposes constructions of four claim terms and phrases: (1) the preamble of Claim 1 limits the claims in the '901 Application to treatment of distributive shock in humans; (2) "dosage form" refers to the physical form of the drug as produced and supplied by the drug manufacturer (as opposed to the form of the drug when administered to the patient); (3) "angiotensin II" refers to human Ang II and the salts thereof; and (4) "treatment" and "treating" refer to an approach for obtaining beneficial or desired results including but not limited to therapeutic benefit, such as an approach that reduces or eliminates the symptoms of distributive

---

[18] A parenteral pharmaceutical is a drug that is administered or introduced to a patient via an entry point that is outside of the digestive track, such as intravenously.

shock.   The PTO Director primarily challenges the first three of these constructions and asserts

that, to avoid prior art, La Jolla is asking for the claim terms to be read narrowly in a way that

does not align with their ordinary meanings.  Specifically, the PTO Director contends that (1) the

preamble in Claim 1 is not limiting on Claim 1 or any other claims; (2) "dosage form" refers to

the physical form of Ang II but does not specify whether it is the form being distributed by the

manufacturer or administered by the medical provider; (3) Ang II refers to all forms of Ang II,

including both human and bovine-derived Ang II.  The PTO Director largely agrees with La Jolla

on the definition of (4) "treatment" or "treating."[19]

    1. Claim Preamble

      The preamble to Claim 1 describes "<u>A dosage form for treatment of distributive shock in

a human patient</u> comprising an amount of angiotensin II or a pharmaceutically acceptable salt

thereof, wherein the amount is about 0.5 to about 20 mg of angiotensin II, and wherein the

dosage form is sterile."  [Dkt. No. 1-2] at 2 (preamble underlined).  The Federal Circuit has held

that a "preamble or a portion of it is limiting when other parts of the patent's claims rely on

predicates in the preamble, or when the preamble is otherwise necessary to give life, meaning,

and vitality to the claim language."  <u>In re Xencor, Inc.</u>, 130 F.4th 1350, 1357–58 (Fed. Cir. 2025)

(internal quotations omitted).  In other words, a preamble is limiting "when the claim(s) depend

on it for antecedent basis" or "when the preamble is essential to understand limitations or terms

in the claim body."  <u>Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d 801, 808

(Fed. Cir. 2002).  Conversely, "where a patentee defines a structurally complete invention in the

---

[19] Because the parties largely agree on the construction of the term "treatment" or "treating," and
because it is not material to resolving this civil action, the Court does not conduct a claim
construction analysis of this term but will accept the parties' definition.

claim body and uses the preamble only to state a purpose or intended use for the invention, the preamble is not a claim limitation." Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997).

The Court finds that plaintiff's position is correct—the preamble of Claim 1 limits the scope of Claim 1 and its dependent claims to the treatment of distributive shock in humans.  It is clear from the formulation of Claim 1 that "the dosage form" in the body of Claim 1 refers to "a dosage form for the treatment of distributive shock in a human patient."  [Dkt. No. 1-2] at 2.  This "antecedent relationship" demonstrates that the patentee intended to "us[e] both the preamble and the body of the claim to define the claimed invention." Bio-Rad Labs. v. 10X Genomics, 967 F.3d 1353, 1371–72 (Fed. Cir. 2020).  Therefore, the use of the term "[t]he dosage form" in Claim 1 and its dependent Claims 5, 6, 13, 14, 20, and 21 refers to a dosage form for treatment of distributive shock in a human patient.  [Dkt. No. 1-2] at 2–3.  As an example, the only way to contextualize whether Claim 20's "aqueous formulation" is "suitable for IV infusion" is to look at "the dosage form of claim 1['s]" intended use as set out in the preamble—i.e., the "treatment of distributive shock in a human patient." Id.

The limiting nature of the preamble of Claim 1 is underscored by the recent decision in In re Xencor, Inc., 130 F.4th 1350 (Fed. Cir. 2025) in which the Federal Circuit agreed with the PTO that a preamble stating, "A method of treating a patient by administering an anti-C5 antibody comprising," was limiting. Id. at 1355.  The Federal Circuit relied on multiple factors, including that one part of the preamble is explicitly limiting on a later part of the claim; that "the more reasonable reading of the preamble" is to read its parts together as they "give color and meaning to [each] other;" and that that "the preamble provides a raison d'être for the claim." Id. at 1358–59 (emphasis omitted).  The same reasoning applies here.  "[A] dosage form," as recited at the beginning of the preamble, is explicitly limiting on "the dosage form" as used later in the

14

claim; the preamble's constituent parts give color and meaning to each other and cannot be neatly packaged into separate portions (e.g., "dosage form" cannot be split neatly from "for the treatment of distributive shock"); and the preamble provides the raison d'être for the claim because it confers the utility of the invention—the treatment of humans with distributive shock. [Dkt. No. 1-2] at 2; see In re Xencor, Inc., 130 F.4th at 1358–59.

The preamble of Claim 1 is not limiting, however, on the independent Claim 7 and its dependent Claim 10. Whereas Claim 1 begins, "A dosage form for treatment of distributive shock in a human patient comprising . . . ," Claim 7 begins, "A dosage form for treatment comprising . . . ." [Dkt. No. 1-2] at 2. The explicit exclusion of the phrase "of distributive shock in a human patient" from Claim 7 means that the word "treatment" in Claim 7 is best read in accordance with its ordinary meaning as encompassing treatments beyond the treatment of distributive shock in human patients. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170 (2012) (stating that the "presumption of consistent usage" provides that "a material variation in terms suggests a variation in meaning").

2. Dosage Form

The next question of claim construction is whether the term "dosage form" refers only to the form in which Ang II is distributed by a drug manufacturer (plaintiff's construction), or to other forms of Ang II, such as those administered to the patient by a medical provider (defendant's construction), or to both. "Dosage form" appears to be an ambiguous term in the art because it is used to refer to: (1) solely the form in which the drug is distributed by a drug manufacturer to a medical provider, (2) solely the form in which the drug is administered to the patient by a medical provider, or (3) both the form in which the drug is distributed and the form in which the drug is administered. Compare Drugs@FDA Glossary of Terms,

https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms#D (last visited Jan. 13, 2026) (FDA's defining "dosage form" as "the physical form in which a drug is produced and dispensed, such as a tablet, a capsule, or an injectable."), with 21 C.F.R. § 314.3 (FDA's defining "dosage form" as "the physical manifestation containing the active and inactive ingredients that delivers a dose of the drug product"), and NIH HIV/AIDS Glossary, https://clinicalinfo.hiv.gov/en/glossary/dosage-form (last visited Jan. 13, 2026) (defining "dosage form" as "the physical form in which a drug is manufactured or administered").

 A person with ordinary skill in the art's definition of dosage form depends, in part, on the role that person has within the healthcare industry. Those persons with five or more years of experience engaged in "the development of parenteral pharmaceuticals for treating human patients" are more likely to use "dosage form" to mean the form in which the drug is distributed, because their day-to-day work is focused on creating and selling pharmaceuticals. [Dkt. No. 68-3] at 156. Whereas those with five or more years of experience "preparing or administering treatments to critically ill human patients with distributive shock" are more likely to use "dosage form" to mean the form in which the drug is administered to the patient, because their day-to-day work is focused on patient care. Id. Because the parties have agreed to a definition of a person with ordinary skill in the art that includes those with experience in drug manufacturing and those who provide medical care, the term "dosage form" as used in the patent applications encapsulates both meanings. See id.

 La Jolla contends that "dosage form" in the patent applications refers only to how the drug is distributed; however, the Court finds that construing "dosage form" to also refer to the form in which a drug is administered is consistent with the ordinary meaning of the term "dosage" and the ordinary meaning of the word from which it derives, "dose." A "dose" is

defined as "the measured quantity of a therapeutic agent to be taken at one time" as a noun, and "to give a dose to, especially: to give medicine to" as a verb. See Merriam-Webster, "dose," https://www.merriam-webster.com/dictionary/dose (last accessed Jan. 13, 2026). The definition of "dosage," similarly, includes "the application of an agent in a measured dose." See Merriam-Webster, "dose," https://www.merriam-webster.com/dictionary/dosage (last accessed Jan. 13, 2026). These definitions make plain that "dosage form" includes within its definition the form in which a drug is administered or given to a patient. To exclude the form in which a drug is administered from the definition of dosage form would be to ignore that the terms "dose" and "dosage" primarily refer to the administration of a substance, rather than to its creation or distribution. See also Merriam-Webster, "dose," https://www.merriam-webster.com/dictionary/dose (last accessed Jan. 13, 2026) (tracing the etymology of the word "dose" to the Ancient Greek word "dosis," which meant "act of giving" and derived from "didonai," meaning "to give").

Federal health agencies' definitions of "dosage form" support the PTO Director's argument that the term is not limited to the drug form supplied by the manufacturer. The FDA defines "dosage form" as "the physical manifestation containing the active and inactive ingredients that delivers a dose of the drug product," and states that a dosage form "includes such factors as" "[t]he physical form of the drug product prior to dispensing to the patient" and "[t]he way the product is administered." 21 C.F.R. § 314.3. According to the FDA, therefore, dosage form includes the form of the drug both before and at administration to a patient. Moreover, the FDA glossary defines dosage form as "the physical form in which a drug is produced and dispensed, such as a tablet, a capsule, or an injectable," which is consistent with the term including forms of drugs both as they are produced and as they are dispensed.

Drugs@FDA Glossary of Terms, supra. Similarly, NIH defines "dosage form" as "[t]he physical form in which a drug is manufactured or administered." NIH HIV/AIDS Glossary, supra (emphasis added).

A definition of "dosage form" that includes not only how a drug is distributed but also how it is administered comports with the fact that many, if not most, medications are administered in the same form in which they are distributed. Tylenol Extra Strength Caplets, for example, are distributed as small pills with 500 mg acetaminophen each, and are generally self-administered by the patient in that same pill form. See Tylenol® Extra Strength Caplets, https://www.tylenol.com/products/headache-pain-relief/tylenol-extra-strength-caplets (last visited Jan. 13, 2026) (stating the "dosage" is to "[t]ake 2 caplets every 6 hours"). In such circumstances, the term "dosage form" is necessarily used to refer to both the form of distribution and the form of administration.

The report of defendant's expert, Dr. Laird Forrest, affirms the Court's conclusion that "dosage form" refers both to how a drug is distributed and how it is administered.[20] Dr. Forrest

---

[20] La Jolla has moved to exclude Dr. Forrest's expert opinions under Federal Rule of Evidence 702 on the grounds that he is not a person with ordinary skill in the art and therefore cannot testify on claim construction. See Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022). Dr. Forrest has a PhD in chemical and biomedical engineering and over 20 years of experience in developing parenteral pharmaceutical dosage forms, and therefore easily meets the agreed definition of a person with ordinary skill in the art. Namely, Dr. Forrest is a person with "at least a Bachelor's Degree in chemistry, biology, pharmaceutical studies, or related area of study with 5 years of experience or more in [bullet point] the development of parenteral pharmaceuticals for treating human patients and/or [bullet point] preparing or administering treatments to critically ill human patients with distributive shock." [Dkt. No. 67] Ex. 44 at 4 (emphasis added). Although Dr. Forrest has not prepared or administered treatments for patients with distributive shock, he qualifies as a person with ordinary skill in the art under this definition; the plain meaning of "and/or" means Dr. Forrest need only have five or more years of experience developing parenteral pharmaceuticals for treating human patients, which he does. See Scalia & Garner, Reading Law: The Interpretation of Legal Texts 125 (2012) ("The literal sense of and/or is 'both or either.'"). Therefore, La Jolla's motion to exclude will be denied.

observes that the FDA defines dosage form as "the physical form in which a drug is produced and dispensed," and the U.S. Pharmacopeia, which sets standards for healthcare products, defines dosage form as "a combination of [the active pharmaceutical ingredient] and often excipients [i.e., inactive substances such as saline that serve as a vehicle for the active pharmaceutical ingredient] to facilitate dosing." [Dkt. No. 67-3] at 65. Dr. Forrest disputes La Jolla's attempt to limit the term "dosage form" only to the form of the drug as manufactured, finding that the patent applications foreclose such a cramped definition. Id. at 66. Specifically, Dr. Forrest explains how both the '901 and '943 Applications discuss a "dosage form to be prepared by a method as described herein," which means that they contemplate a liquid solution prepared by reconstituting freeze-dried Ang II as a type of dosage form. See id. For these reasons, Dr. Forrest opines that "each [form] of angiotensin II—the lyophilizate, the reconstituted aqueous solution (or liquid concentrate), or the final diluted solution for administration—is a physical form of angiotensin II to facilitate dosing and therefore is a 'dosage form.'" Id. at 67.

La Jolla contends that its usage of the term "dosage form" in the patent applications would make clear to a person with ordinary skill in the art that it is only referring to how the drug is manufactured, not how the drug is administered. As an example, La Jolla points to Claims 6 and 37, which require the "dosage form" to be "a lyophilizate," (i.e., a freeze-dried substance), which obviously cannot be administered to patients intravenously without first being diluted into a liquid solution. [Dkt. No. 1-2] at 2–3. La Jolla also observes that Claims 20, 21, and 26 describe "diluting" (Claims 20 and 26) or "combining" (Claim 21) a dosage form in order "to achieve" or "to provide" an "aqueous formulation" or "solution." Id. To be sure, these usages of "dosage form" support La Jolla's argument that the term sometimes is used to refer to the form

in which the drug is distributed; but such usages do nothing to discredit the PTO Director's argument that the term is also used in plaintiff's patent applications to refer to how a drug is administered to a patient. Indeed, as Dr. Forrest established, elsewhere in the patent applications the term "dosage form" is used to refer to the form that is administered. See [Dkt. No. 67-3] at 66 (explaining how the applications describe "dosage form[s] to be prepared by a method described herein" and therefore contemplate "dosage forms beyond just the physical form in which the angiotensin II is purchased from the manufacturer"). Accordingly, the Court finds that "dosage form" as used in the patent applications refers to both the forms in which the Ang II product is distributed by a manufacturer—whether in freeze-dried or liquid form—and to the liquid forms of the product that are administered to patients intravenously.

### 3. Type of Ang II

The final claim construction dispute between the parties is whether "angiotensin II" refers only to human Ang II or to all types of Ang II, including human, animal/bovine, and synthetic/modified. Because the patent applications explicitly refer to Ang II as including human, bovine, and modified forms of Ang II—all of which are encapsulated by the ordinary meaning of the term—a person with ordinary skill in the art would understand that "angiotensin II" as used in the applications refers to both human and non-human forms of Ang II. Accordingly, the Court rejects La Jolla's cramped reading of Ang II and adopts the PTO Director's more accurate construction.

The '901 and '943 Applications each explicitly state, "Angiotensin II used in the formulations described herein can be a human angiotensin II or a mammalian angiotensin II, for example, angiotensin II from a rodent, a feline, a canine, a porcine, an ovine, a bovine, an equine, or a primate." [Dkt. 1-1 at 4]. The applications describe various human and mammalian

Ang II embodiments, including "5-valine angiotensin II amide," the bovine-derived Ang II

variant used in Hypertensin.  This clear choice to establish "a special definition [of] a claim term

by the patentee" means that such definition must "govern[]" the Court's interpretation of the

meaning of Ang II.  Phillips, 415 F.3d at 1316.

      Moreover, the ordinary meaning of "angiotensin II" includes both human and non-human

types of Ang II, including the bovine-derived Ang II used in Hypertensin.  This meaning is

consistently reflected in the prior art, La Jolla's own publications, and reports from experts on

both sides of this litigation.  See [Dkt. No. 67-1] at 354–55 (La Jolla expert Benken stating that

"[b]efore Giapreza®, most research utilizing angiotensin II had been conducted with one of two

synthetic forms of angiotensin II," including "a modified version of the bovine variant of

angiotensin II"); [Dkt. No. 67-2] at 20 (a 2017 systemic review of Ang II administration safety

stating that most studies of Ang II "used one of two synthetic forms of [angiotensin II], an amide

derivative of the bovine amino acid sequence or an acetate salt of the human sequence"); id. at

36 (a La Jolla report stating that "[a]ngiotensin II has been used in several clinical studies" and

explaining that "[t]hese studies were conducted with 5-valine (5-val) angiotensin II

manufactured as 'hypertensin'"); [Dkt. No. 67-3] at 58–59 (Dr. Forrest opining that Ang II

should "be construed as human or mammalian angiotensin II" and that doing so would be

"consistent with th[e] language in the Applications' specification[s]"); id. at 283 (2016 prior art

from the journal Hypertension Research identifying the "amino-acid sequences" for Ang II by

the species from which the Ang II was derived, and listing human, cow, and eleven other

species).  This consistent usage of Ang II as referring to both its human and non-human forms is

"indicative of what all those skilled in the art generally believe [the] term means."  In re

Cortright, 165 F.3d 1353, 1358 (Fed. Cir. 1999).

La Jolla contends that a person of ordinary skill in the art would understand Ang II to mean solely human Ang II because, in La Jolla's view, human Ang II is the only Ang II variant suitable for the treatment of distributive shock in a human patient. See Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (stating that a court should consider the function of the claimed invention in claim construction). La Jolla argues that this construction should be adopted given that the preamble in the '901 Application limits its claim to "[a] dosage form for treatment of distributive shock"—a limitation the Court has accepted. See Section III(C)(1), supra.

This argument is unpersuasive. The patent applications themselves state that "[a]ngiotensin II can constrict both arteries and veins and can increase blood pressure," and define Ang II as including both human and non-human forms. [Dkt. No. 1-1] at 8. This definition is consistent with the understanding in the prior art since the mid-twentieth century that Ang II can be used to increase blood pressure, regardless of whether the Ang II is human or non-human derived. Hypertensin is a bovine-derived form of Ang II that has been approved by the FDA and was used in clinical settings to treat forms of shock, including distributive shock. Even if Hypertensin or other non-human forms of Ang II did not optimally treat distributive shock (which the patent applications do not contend), they have still been used for that purpose, and the patent claims do not contain a therapeutic efficiency requirement. See Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1348 (Fed. Cir. 2002) (holding that courts may not read limitations into a claim that are not present in the claim itself). The term "angiotensin II" therefore must be construed to refer to both human and mammalian Ang II, which includes the bovine-derived, 5-valine version of Ang II in Hypertensin. Based on this evidence the Court finds that the ordinary meaning of Ang II and how it is defined in the patent applications

includes the human and non-human forms of Ang II.  Therefore, the PTO Director's definition of the term will be adopted.

C. <u>Anticipation</u>

Having determined the meaning of the contested terms in the patent claims, the parties' cross-motions for summary judgment can be considered.  Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u>  In determining whether the movant has made this showing, a court must "view[] the evidence in the light most favorable to the nonmoving party and mak[e] justifiable inferences in [its] favor." <u>United States v. Stover</u>, 131 F.4th 199, 202 (4th Cir. 2025).

The existence of some alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment;" rather, there must "be no genuine issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986) (emphasis added); <u>see Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Phoenix Savings & Loan v. Aetna Casualty & Surety Co.</u>, 318 F.2d 245 (4th Cir. 1967).  Summary judgment is not a "disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).  Thus, it is the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." <u>Drewitt v. Pratt</u>, 999 F.2d 774, 778–79 (4th Cir. 1993) (internal quotations omitted).  When there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately and determine[s] whether summary judgment is appropriate as to each." <u>Monumental Paving & Excavating. Inc. v. Pa. Mfrs.' Ass'n Ins. Co.</u>, 176 F.3d 794, 797 (4th Cir. 1999).

The PTO Director's motion for summary judgment contends that all the claims in La Jolla's '901 and '943 Applications were anticipated or obvious, and therefore not patentable, because the dosage forms and method of administration that they describe were known in the art as of the applications' effective filing date. To evaluate this contention, the Court will first assess whether the claims were anticipated. Any claims that were not anticipated will then be assessed for whether they were obvious.

To be patentable, a claimed invention must not be "anticipated"; in other words, the claimed invention cannot have been "patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date." 35 U.S.C. § 102(a)(1); see Brown v. 3M, 265 F.3d 1349, 1351 (Fed. Cir. 2001). To be anticipated, all elements and limitations of the claimed invention must be found within a single prior art reference. Id. Anticipation is a question of fact, id., and the question of whether a claimed invention was anticipated may be decided on summary judgment if there is no genuine dispute of material fact. Ladatech, LLC v. Illumina, Inc., 841 F. Supp. 2d 860, 884 (D. Del. 2012). "[T]he dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from the prior art reference's teaching that every claim element was disclosed in that single reference." Wasica Fin. GmbH v. Cont'l Auto. Sys., 853 F.3d 1272, 1284 (Fed. Cir. 2017). "When a patent claims a range [e.g., of dose amounts] . . . that range [wa]s anticipated by a prior art reference if the reference discloses a point within the range." Ineos USA LLC v. Berry Plastics Corp., 783 F.3d 865, 869 (Fed. Cir. 2015).

On this record, the Court finds that the 18 patent claims at issue in the '901 and '943 Applications were anticipated and therefore are not patentable. Claim 1 of the '901 Application recites:

A dosage form for treatment of distributive shock in a human patient comprising an amount of angiotensin II or a pharmaceutically acceptable salt thereof, wherein the amount is about 0.5 to about 20 mg of angiotensin II, and wherein the dosage form is sterile.

[Dkt. No. 1-2] at 2.  This claim was anticipated by the 1969 PDR, which describes Hypertensin as an "angiotensin amide" that is used to treat human patients "in states of shock and collapse in which the blood pressure must be restored" quickly, a category of ailments which necessarily includes distributive shock.  [Dkt. No. 67-3] at 2; see Ineos USA LLC v. Berry Plastics Corp., 783 F.3d 865, 872 (Fed. Cir. 2015) ("Verbatim disclosure of a particular species is not required in every case for anticipation because disclosure of a small genus can be a disclosure of each species within the genus.").  The PDR further explains in its "dosage and administration" section for Hypertensin that the medication comes in vials of "2.5 mg," and states that "[t]o prepare the solution, dissolve the Hypertensin[] by adding 5 ml of sterile distilled water to the vial."  Id. at 3.  Because the parties and their experts agree that the angiotensin amide in Hypertensin is a form of bovine-derived Ang II—and because the Court has determined that this form of Ang II is within the definition of the term "angiotensin II" as it is used in the patent applications—the PDR anticipated all aspects of Claim 1 in the '901 Application.  Namely, the PDR identifies Hypertensin as "[a] dosage form" for "treatment of distributive [and other forms of] shock in a human patient" that is comprised of between "about 0.5 to about 20 mg of angiotensin II [i.e., 2.5 mg of angiotensin II]" and is "sterile," as intravenously administered medications must be.  Id.

The PDR also anticipated five of the '901 Application claims that are dependent on Claim 1—Claims 5, 6, 13, 20, and 21.  Claim 5 states that the dosage form must be "substantially free of pyrogens," [Dkt. No. 1-2 at 2], which Hypertensin was, as Dr. Forrest opined.  See [Dkt. No. 67-3] at 76 (because the PDR states that Hypertensin is "suitable and intended for

administration to treat human patients by intravenous infusion," it is "thus necessarily substantially free of pyrogens, [which] produce a fever"). Moreover, the PDR discloses three components—angiotensin amide, mannitol, and thiomerosal—none of which contains pyrogens. See id. Claim 6 states that the Ang II "is provided as a lyophilisate," [Dkt. No. 1-2 at 2], and the PDR explicitly refers to Hypertensin being supplied in "vials, each containing . . . lyophilized powder." [Dkt. No. 67]. Claim 13 recites a "dosage form" having a "volume between 0.5 mL and 100 mL," [Dkt. No. 1-2 at 2], and the PDR discloses a dosage form with a volume in this range. See [Dkt. No. 67-3] at 3 ("To prepare solution, dissolve the Hypertensin[] by adding 5 ml of sterile distilled water to the vial.").

As for Claims 20 and 21, those pertain to a "kit comprising [of] the dosage form of claim 1" and associated instructions for diluting the dosage form. See [Dkt. No. 1-2] at 3. The '901 Application defines "kit" "[a]s used herein" as "any delivery system for delivering materials," for example, "enclosures containing the relevant materials (e.g., angiotensin II) and/or supporting materials (e.g., instructions, tubing, valves, or needles)." [Dkt. No. 1-1] at 6. The '901 Application further explains that "kits include a container or formulation that contains angiotensin II," id. at 4, and it defines a "vial" as a type of glass or plastic "container," "in accordance with its plain [and] ordinary meaning." Id. The PDR, meanwhile, discloses that the angiotensin II product Hypertensin is delivered in "vials," [Dkt. 67-3] at 3, which are "container[s] . . . that contains angiotensin II" and thus constitute a "delivery system for delivering materials" or "kit," [Dkt. No. 1-1] at 3, 6. Moreover, the PDR describes "each [vial as] containing 2.5 mg angiotensin amide," [Dkt. 67-3] at 3, which is within the range of the dosage form as described in claim 1, i.e., "about 0.5 mg to about 20 mg of angiotensin II." [Dkt. No. 1-2] at 2. Thus, the PDR anticipated Claim 20's recitation of "[a] kit comprising (i) the

dosage form of claim 1." Claim 21, meanwhile, requires such a kit to be comprised of "2 to 5 units of the dosage form of claim 1," [Dkt. No. 1-2] at 3, which the PDR anticipated by referring to "vials," a term which encompasses two, three, four, or five vials. [Dkt. 67-3] at 3.[21]

Three claims remain in the '901 Application: independent Claim 7, and dependent claims 10 and 14. The first two claims were anticipated by the PDR. Claim 7 states, "[a] dosage form for treatment comprising an amount of a sterile, aqueous formulation of angiotensin II, or a pharmaceutically acceptable salt thereof, wherein the amount is about 0.5 to about 20 mg of angiotensin II." [Dkt. 1-2] at 2. Just as Claim 1 was anticipated by the PDR, so too is Claim 7. The PDR explains that Hypertensin is supplied in vials of "2.5 mg" of Ang II, and states that "[t]o prepare the solution, dissolve the Hypertensin[] by adding 5 ml of sterile distilled water to the vial." [Dkt. No. 67-3] at 3. The PDR therefore discloses an aqueous formulation of Ang II that has between 0.5 mg to 20 mg—specifically, 2.5 mg—of Ang II. And, as explained above, this formulation is necessarily sterile as it is comprised of "sterile distilled water" and other sterile ingredients, and is made for intravenous infusion in a human patient. Id.

Claim 10, meanwhile, describes a "dosage form of claim 7" that "has a concentration of about 0.5 to about 20 mg/mL of angiotensin II." [Dkt. No. 1-2] at 2. This too was anticipated by the PDR, which describes creating an aqueous formulation of Ang II with a concentration of 0.5

---

[21] The "claimed instructions" described in Claims 20 and 21 need not be considered in the anticipation analysis because they "in no way function with the drug to create a new, unobvious product" and thus "are not entitled to patentable weight." AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1065 (Fed. Cir. 2010); see also id. ("Removing the instructions from the claimed kit does not change the ability of the drug to treat [distributive shock].").

mg/mL that is created by "adding 5m[L] of sterile distilled water" to a vial of "2.5 mg" of Ang II.  [Dkt. No. 67-3] at 3.[22]

Having determined that all the claims in the '901 Application except for Claim 14 were anticipated, the Court turns to the '943 Application.  The '943 Application has one independent claim (Claim 26) and eight claims that are dependent on it.  Claim 26 recites:

> A method for treating distributive shock in a human patient, comprising: diluting a dosage form comprising about 0.5 to about 20 mg of angiotensin II in a pharmaceutically acceptable carrier to provide diluted solution of angiotensin II; and administering the diluted solution of angiotensin II to the patient via continuous intravenous infusion.

[Dkt. No. 67] at 46.  The PDR anticipated this claim.  As discussed above, the PDR discloses a dosage form with 2.5 mg of Ang II that is diluted by adding an aqueous solution to the vial in which the Ang II is contained.  The PDR explains that, after further dilution in physiological saline or glucose solution, which are pharmaceutically acceptable carriers, this Ang II solution is administered to a patient via continuous intravenous infusion for the treatment of shock—a category of ailments which necessarily includes distributive shock.  See [Dkt. No. 67-3] at 3 (explaining how "Hypertensin-CIBA (angiotensin amide) should be given by slow intravenous infusion" and describing how the infusion is measured in milliliters of solution delivered per minute).

The PDR also anticipated many of the dependent claims in the '943 Application.  Claim 31 requires the "pharmaceutically acceptable carrier" to be a "saline solution," [Dkt. No. 67] at 46, and the PDR describes "physiological saline . . . solution" as being one of the "only" two

---

[22] As Dr. Forrest opined, Claims 1, 5, 6, 7, 10, 13, 14, 20, and 21 were not only anticipated by the PDR, but were also anticipated by Nassif and Del Greco.  It is unsurprising that these two additional sources of prior art anticipate these claims, because these sources, like the PDR, each discuss Hypertensin, which matches the description provided by each of these claims.  See [Dkt. No. 67-3] at 82–86, 91–128.

solutions that should be used as a carrier for Ang II to be intravenously infused. [Dkt. No. 67-3]
at 3. Because physiological saline is a 0.9% sodium chloride solution, the PDR additionally
anticipated Claim 32, which requires "the saline solution" to be "0.9% sodium chloride." See
[Dkt. No. 67-3] at 141 (Dr. Forrest's explaining that "physiological saline . . . is 0.9% sodium
chloride"). Claim 33, which requires "the diluted solution of angiotensin II" to have "a
concentration of about 0.005 mg/mL to above 0.01 mg/mL," is also anticipated by the PDR. The
PDR explains that medical providers using Hypertensin should "add 2.5 mg (the contents of one
vial) to 500 ml of fluid (physiological saline or glucose solution only)," thereby creating a
solution with 0.005 mg/mL of Ang II, which is within the range described by Claim 33. [Dkt.
No. 67-3] at 3.

Of the remaining '943 Application claims, the PTO Director asserts that only Claims 37,
38, and 39 were anticipated. Claim 37, which requires that the dosage form be a "lyophilizate,"
was anticipated by the PDR, which describes the 2.5 mg of Ang II "as lyophilized powder."
[Dkt. No. 67-3] at 3. Claim 38 requires that the method for treating distributive shock as
described in Claim 26 be for treating "septic shock," which the PDR discloses by stating that
Hypertensin is indicated for treating "states of shock and collapse in which blood pressure must
be restored with a minimum of delay to permit perfusion of vital tissues." [Dkt. No. 67-3] at 3;
see id. at 142–43 (Dr. Forrest opining that "the PDR discloses to one of ordinary skill in the art
that Hypertensin is indicated for treating distributive shock, and specifically septic shock").
Lastly, the PDR anticipated Claim 39, which requires the diluted solution in Claim 26 to be

"comprise[d of] about 0.005 mg/mL to about 0.01 mg/mL angiotensin II," for the same reason

that it anticipates Claim 33—the PDR describes a solution with 0.005 mg/mL of Ang II.[23]

 Having found that the PDR anticipated all but Claim 14 in the '901 Application and

Claims 35 and 36 in the '943 Application, the Court will determine whether these claims are

obvious given the prior art.

D. Obviousness

 "[A]n invention that would have been obvious to a person of ordinary skill in the relevant

art at the time of the invention is not patentable." Disney Enters. v. Rea, 940 F. Supp. 2d 288,

292–93 (E.D. Va. 2013). Specifically,

> A patent for a claimed invention may not be obtained, notwithstanding that the
> claimed invention is not identically disclosed [and thus anticipated] as set forth in
> section 102, if the differences between the claimed invention and the prior art are
> such that the claimed invention as a whole would have been obvious before the
> effective filing date of the claimed invention to a person having ordinary skill in
> the art to which the claimed invention pertains.

35 U.S.C. § 103.

 Obviousness is a question of law based upon underlying factual considerations, which

include (1) "the scope and content of the prior art," (2) "differences between the prior art and the

claim[ed invention]," (3) "the level of ordinary skill in the pertinent art," and (4) objective

indicia such as "commercial success," "failure of others," and "long felt but unsolved needs."

Disney, 940 F. Supp. 2d at 293 (E.D. Va. 2013) (citing Graham v. John Deere Co. of Kan. City,

383 U.S. 1, 17 (1966)); see KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 427 (2007). The

obviousness analysis "measures the difference between the claimed invention and the prior art to

determine whether the subject matter as a whole would have been obvious at the time of

---

[23] As he did with the '901 Application, Dr. Forrest opined that Claims 26, 31, 32, 33, 37, 38, and
39 were also anticipated by Nassif and/or Del Greco. See [Dkt. No. 67-3] at 143–165.

invention" to a person having ordinary skill in the art. Disney, 940 F. Supp. 2d at 295 (quoting Unigene Labs., Inc. v. Apotex, Inc., 655 F.3d 1352, 1360 (Fed. Cir. 2011)). "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." Pfizer Inc. v. Sanofi Pasteur Inc., 94 F.4th 1341, 1347 (Fed. Cir. 2024). "In the context of claimed numerical ranges," the Federal Circuit has held that "an overlap between a claimed range and a prior art range creates a presumption of obviousness that can be rebutted with evidence that the given parameter was not recognized as result-effective." Id. (emphasis omitted).

The PTO Director found that each of the three claims at issue that were not anticipated would have been obvious to a person of ordinary skill in the art as of the effective filing date. Claim 14 of the '901 Application is dependent on Claim 1 (via dependance on Claim 13), and describes "a dosage form [that] has a volume of about 2 mL or about 1 mL." [Dkt. No. 1-2] at 4. No one source of prior art explicitly references a dosage form that has this volume; however, as Dr. Forrest explains, "1 mL was [and remains] a very common volume" for reconstitution of lyophilized Ang II and similar drug products because 1 mL "is a sufficient volume to solubilize [i.e., make soluble] 2.5 mg of lyophilized angiotensin II." [Dkt. No. 67-3] at 103. It is unsurprising, then, that the specific formulation described in Claim 14 was obvious from prior art, namely, from a combination of the PDR and Tidmarsh. The PDR discloses a freeze-dried dosage form with 2.5 mg of Ang II, as discussed above. Id. at 3. Tidmarsh discloses a pharmaceutical "composition" that may be provided via "intravenous infusion" to treat a patient with "distributive shock" that "in certain embodiments" "comprises angiotensin II at a concentration of about 2.5 mg/mL." [Dkt. No. 68-3] at 28. Tidmarsh explains that such Ang II may be "5-valine angiotensin II amide"—the same version of Ang II contained in Hypertensin

31

that is described by the PDR.  See [Dkt. No. 68-3] at 30; [Dkt. No. 67-3] at 3; see also id. at 5

(Del Greco stating that Hypertensin is 5-valine version of Ang II).  Therefore, as Dr. Forrest

opines, the 2.5 mg/mL concentration taught by Tidmarsh would result from reconstituting the 2.5

mg of freeze-dried Ang II taught by the PDR with about 1 mL of liquid solution—thereby

creating the dosage form within the range recited by Claim 14.

Both Claims 35 and 36 of the '943 Application depend on Claim 26, which, as discussed

above, was anticipated by the PDR.  Claim 35 requires the Ang II dosage form of Claim 26 to be

"in an aqueous solution having an angiotensin II concentration of 2.5 mg/mL."  [Dkt. No. 67] at

46.  In addition to the PDR references described above, Tidmarsh discloses an Ang II dosage

form that may be "5-valine angiotensin II amide"—the same version of Ang II contained in

Hypertensin—and that "comprises angiotensin II at a concentration of about 2.5 mg/mL."  [Dkt.

No. 68-3] at 28, 30.  The PDR and Tidmarsh references therefore render Claim 35 obvious.

Claim 36 recites "[t]he method in claim 35, wherein the dosage form comprises about 1 mL of

the aqueous solution."  [Dkt. No. 67] at 46.  Just like in Claim 14, a person with ordinary skill in

the art starting with the 2.5 mg vial of Ang II disclosed in the PDR who sought to achieve the 2.5

mg/mL concentration disclosed in Tidmarsh would use 1 mL of aqueous solution.  Therefore

Claim 36 was also obvious based on the prior art.  See [Dkt. No. 67-3] at 166–67 (Dr. Forrest

reaching the same conclusion).[24]

Having found that each of the patent claims were either anticipated or obvious even when

viewing the evidence in the light most favorable to La Jolla, the Court will grant summary

judgment in favor of the PTO Director because no genuine dispute of material fact remains.

---

[24] As with the anticipation analyses, Del Greco and Nassif can largely be substituted for the PDR
in these obviousness analyses, because all three sources of prior art discuss the 5-valine Ang II
drug Hypertensin.  See [Dkt. No. 67-3] at 101–104, 165–168.

### III. CONCLUSION

La Jolla claims that it should be rewarded with patents for developing a treatment regimen for distributive shock that differs from the mid-twentieth century medication Hypertensin because it uses the human variant of Ang II, can be shipped in liquid dosage form pre-mixed by the distributor, and contains a larger amount of the active ingredient. La Jolla's patent applications that are in front of this Court, however, sweep much more broadly than these alleged innovations. The applications fail to specify that they are referring only to the human variant of Ang II. They do not clarify whether the liquid dosage form of the medication must be pre-mixed by the distributor or can be mixed by the medical provider. And the dosage amounts to which the applications refer were discussed in publicly available research, including La Jolla's own, published before the effective filing date in 2017. Because the evidence overwhelmingly shows that all the claims at issue are either anticipated or obvious, the Court will deny La Jolla's motion for summary judgment, grant the PTO Director's motion for summary judgment, and enter judgment in the PTO Director's favor by an Order to be issued with this Memorandum Opinion.

Entered this 21 day of January, 2026.

Alexandria, Virginia

_____/s/_____

Leonie M. Brinkema
United States District Judge